**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Peggy Ann CARTER, Defendant-
Appellant.**

**No. 73-1224.**

United States Court of Appeals,
Ninth Circuit.

July 2, 1973.

'Roger S. Ruffin' (argued), Ruffin & Whalen, La Jolla, Cal., for defendant-appellant.

Jim Meyers, Asst. U. S. Atty. (argued), Harry D. Steward, U. S. Atty., Shelby R. Gott, Asst. U. S. Atty., San Diego, Cal., for plaintiff-appellee.

Before BARNES and WALLACE, Circuit Judges, and WILLIAM M. BYRNE, Sr.,* District Judge.

WILLIAM M. BYRNE, Sr., District Judge:

Peggy Carter appeals from her conviction for importing both heroin and cocaine [violations of 21 U.S.C. §§ 952, 960, and 963] and possessing such contraband with intent to distribute it [violations of 21 U.S.C. § 841(a)(1)]. Her non-jury trial was conducted on the facts adduced at her unsuccessful pretrial motion to suppress which, by stipulation, were incorporated by reference into the government's case-in-chief.

On December 2, 1971, at approximately 8:15 P.M., an automobile occupied by Carter, another woman named Howard, and two men named Kinsey and Evans entered the United States at San Ysidro, California, port of entry. The male passengers occupied the front seat while the female passengers occupied the back seat. At the primary inspection station, Customs Inspector Campbell requested

---

* Honorable William M. Byrne, Sr., United States Senior District Judge, Central District of California, sitting by designation.

the driver, Kinsey, to open the rear trunk. While doing so, Kinsey informed him that Evans was the owner of the automobile. Campbell then proceeded to Evans' side of the automobile, questioned him briefly, and noticed "tracks" on his arm. He also noticed that the female passengers appeared nervous. Consequently, he decided to investigate further, got into the back seat of the automobile, and directed them to the secondary inspection point. While en route to that location, he noticed that Carter "just couldn't sit still."

At the secondary inspection point, all four of the occupants were instructed to exit the automobile and enter the customs office. Once inside, Campbell conducted a pat-down weapons search of the two men with negative results. However, he did notice that Evans' heart "was thumping away like mad." Then, Campbell checked the arms of all four of the suspects and determined that Kinsey, the driver, was the only one without visible needlemarks on his arms. In addition, Campbell suspected that the two women were "under the influence" because of their eyes and demeanor. As for their eyes, the pupils were pinpointed. As for their demeanor, although they initially seemed loud and boisterous, as time went on, they became very lackadaisical and seemed "like they didn't care what was happening." In addition, within five munutes of the time that the four were brought inside the customs office, a routine record check was run on them via teletype. As a result thereof, the customs inspectors obtained a computer printout which indicated that, on June 28, 1970, Carter had been arrested at the border for possessing eight ounces of heroin.

Consequently, Campbell and a Mr. Lasher, the supervisor of customs inspection, instructed a Mrs. Lohman, a customs inspectress, to conduct a strip search of the two women. At Campbell's suggestion, Carter was inspected first. Mrs. Lohman, took her into the search room and told her to remove her clothing. Carter first took off her blouse and then her boots. When she had her capris down to her knees, however, Mrs. Lohman noticed an object which looked like a piece of brown paper bag which was tucked away between Carter's legs and under her pantyhose. When Lohman asked her to remove it, Carter merely pushed it to the rear where Lohman couldn't see it. Lohman then took ahold of Carter's arm and again told her to remove the object. Instead, Carter merely pushed it further to the rear. When an argument occurred between the inspectress and her suspect, Lasher entered the room and Campbell stood in the doorway. Lohman described the preceding events to Lasher who then attempted to persuade Carter to cooperate. Suddenly, Lohman pulled down on Carter's pantyhose and the object, which subsequently was found to contain heroin and cocaine, fell on the floor near Campbell who retrieved it. Then, the two men left the room.

Mrs. Lohman requested that Carter continue to disrobe. However, when Carter took her capris off, she bundled them up and struck Lohman over the head with them. After a slight scuffle, Lasher re-entered the room and stayed there facing the wall until the strip search was finished so that no further disturbance would occur.

■ Although both Carter and the government agree as to the law of this Circuit which governs the validity of the strip search of her body, they disagree as to whether or not the government met its burden of showing that the search met the requirements of the Fourth Amendment.

In Henderson v. United States, 390 F. 2d 805, 808 (C.A.9, 1967), this court stated that, in a border search situation, the customs officials must have a "real suspicion" directed specifically at the person whom they desire to strip search before such a search can be lawful under the Fourth Amendment.

Some two years later, in United States v. Guadalupe-Garza, 421 F.2d 876, 879

(C.A.9, 1970), the court defined "the real suspicion test" as being

". . . subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross [the United States] border is concealing something on his body for the purpose of transporting it into the United States contrary to law.

"The objective, articulable facts must bear some reasonable relationship to suspicion that something is concealed on the body of the person to be searched; . . ."

The record contains an overabundance of objective, articulable facts on which the customs officials based their decision to strip search Carter. Such facts include the "tracks" on both of her arms, her nervousness and demeanor, her pinpointed eyes, the computer printout, and the nervousness, demeanor and tracks on the arms of her companions. United States v. Holtz, 479 F.2d 89 (C.A.9, 1973); United States v. Velasquez, 469 F.2d 264 (C.A.9, 1972); United States v. Gil deAvila, 468 F.2d 184 (C.A.9, 1972); United States v. Shields, 453 F.2d 1235 (C.A.9, 1972).

Carter contends that, since Lasher and Campbell were present during a portion of the strip search, the contraband taken from her person should have been suppressed because her Fifth Amendment right to due process of law and her alleged right of privacy were violated. She alleges that

". . . no circumstances and no compelling state interest can be found here which would warrant the search of [her] nude body by male agents of the government."

Her contention is frivolous and based on a distortion of the facts. The district court addressed itself to Carter's contention at the hearing on her motion to suppress. It stated:

"I cannot say, however, that [Carter] did not in substantial portion bring on her own invasion of privacy, for its seems to the Court as far as I'm concerned that there was sufficient evidence that her acts and her actions alone were what caused the officers to enter the room."

We agree with the district court's assessment of the facts.

Affirmed.