**Big BLACK and Shango Bahati Kakawana, Plaintiffs,**

**v.**

**Michael AMICO, Individually and as Sheriff of Erie County, et al., Defendants.**

**Civ. No. 74–540.**

United States District Court, W. D. New York.

Dec. 20, 1974.

Plaintiffs pro se., Michael Deutsch, and Thomas Burke, Buffalo, N. Y., of counsel, for plaintiffs.

James L. Magavern, Erie County Atty. (William J. Diggins, Buffalo, of counsel), Buffalo, N. Y., for defendants.

CURTIN, Chief Judge.

This action, brought pursuant to 42 U.S.C. § 1983, was commenced on November 22, 1974. The defendants were directed to show cause why an order should not be entered which, among other things, enjoined them from requiring one of the plaintiffs, Big Black, also known as Frank Smith, to submit to a strip search prior to visiting Shango Bahati Kakawana, also known as Bernard Stroble, at the Erie County Holding Center [E.C.H.C.]. The purpose of Mr. Black's visit to the E.C. H.C. was to meet with Mr. Shango and other detained defendants who are awaiting trial in various Attica indictments. On December 13, 1974 the plaintiffs' oral application for a temporary restraining order was denied. A hearing was held on December 16 and 17 to determine whether a preliminary injunction should issue.

After considering the evidence at the hearing and the briefs supplied by the parties, the following constitutes the court's findings of fact and conclusions of law on the question of the preliminary injunction.

FINDINGS

The plaintiff Shango is currently incarcerated in the E.C.H.C. awaiting disposition of a number of pending felony indictments arising out of the September 1971 incidents at the Attica Correctional Facility. The plaintiff Black is a codefendant with Shango in a number of these indictments and is also director of the Attica Brothers Legal Defense [A.B.L.D.]. Black is currently on parole and free on bail. Black and Shango are representing themselves in the state criminal proceedings, and appearing pro se in this action as well.

Frank Festa, Superintendent of the E.C.H.C., testified that he is responsible for the security of that institution. He has been acquainted with Black from the time that Black was first housed in the E.C.H.C. in late 1972. After Black's release on parole in August 1973, Mr. Festa permitted him to reenter the E.C.H.C. to confer with codefendants. He also permitted Black to confer with other detained Attica defendants in his capacity as A.B.L.D. director.

From August 1973 until November 1974 Black gave Mr. Festa one day's notice of his intended visit and entered by the rear door of the E.C.H.C. His legal papers, briefcase or packages were searched and he emptied his pockets. He was given a pat-down search by a jail employee, limited to his outer clothing, and no disrobing was required. He carried on his meetings with Shango or other defendants in the gallery conference rooms which were used ordinarily by attorneys, probation officers and social workers.

This procedure was changed after November 2, 1974 when Black was arrested on a felony marihuana charge by local police officers. When Black appeared at the E.C.H.C. on November 8 and attempted to enter, he was informed that, pursuant to a directive of Superintendent Festa, a strip search was now required. Black refused to submit and he was denied access to the E.C.H.C. and unable to confer with Shango or any of the other incarcerated defendants. He reported this incident to A.B.L.D. staff counsel, Michael Deutsch. Deutsch conferred with Mr. Festa, who refused to change his direction. This action followed.

At the hearing Festa testified that a strip search would entail complete disrobing in a private room, in the

presence of an officer. There would be a visual inspection of the mouth and ears, but no rectal search was anticipated.

The E.C.H.C. has no published rules regarding the searching of persons entering the facility through the rear door. Festa explained that since there was no metal detection equipment at this entrance, the usual practice is to inspect briefcases and to inquire if the person seeking to come in is carrying a weapon. If the individual is known to the officer on duty, the inspection is sometimes waived. The visitor fills out a card giving his name and listing the names of the individuals the visitor desires to meet with.

Ms. Dorothy Teryl, a volunteer paralegal worker associated with the New York Civil Liberties Union, testified in behalf of the plaintiffs. During the past year she regularly visited the jail without being subjected to any search. However, when she was going to visit one of the Attica defendants housed on the JJ gallery, the contents of her briefcase and purse were inspected.

Roger Champen, a convicted felon and a codefendant in the Attica cases with Black and Shango, testified about his visits to the E.C.H.C. On several previous occasions during the past year, he filled out the card, was asked about weapons, and was patted down by a deputy.

In June of 1974 Carolyn Curry, a law student and A.B.L.D. staff member, inadvertently had a razor blade mixed in with her papers when she was coming into the facility. At the entrance when she herself discovered the razor blade, she turned it over to a guard who accepted her explanation and permitted her to enter. She has continued to visit the E.C.H.C. without incident since that time without being subjected to a strip search.

Mr. Festa explained that only inmates coming into the facility are routinely strip searched as part of the admission process. At one time, some Attica defendants who were on bail were required to disrobe prior to conferences with E.C.H.C. inmates. However, this practice was abandoned more than six months ago. At the present time, the plaintiff Black is the only person seeking to enter the E.C.H.C. for conferences who is required to submit to a strip search. In his testimony, Superintendent Festa stated that the reason for requiring this strip search, in Black's case, was because of Black's prior felony convictions, his current parole status, the serious charges pending against him under the Attica indictments, a prior conviction for a drug offense, and Black's recent arrest on a drug charge in Buffalo. The Superintendent thought it was reasonable to suspect from that arrest that Black was using and possessing marihuana. However, he also testified that he was surprised when he heard of Black's arrest on a marihuana charge.

In his testimony, Festa said there were instances of inmates attempting to smuggle drugs into the facility in their mouths or taped to the bottoms of their feet. He also described instances where inmates coming back from court appearances were under the influence of, or in possession of, drugs. Festa claimed that drugs and other contraband were coming into the E.C.H.C. and he needed to adopt measures to cut off the flow.

During the hearing, the defendants introduced into evidence a box of material they considered to be contraband, taken during shakedowns of JJ gallery conducted in the last few months. Most of the material was simply debris which had been accumulated in the cells over a period of time. Old newspapers, candy wrappers and plastic food containers were in the box. There were no weapons or drugs. Most of the material was legitimately in the facility, and there was no evidence that any of it came from inmate contact with outside visitors. Additionally, none of the items offered was linked to either of the plaintiffs in the instant proceeding.

Mr. Festa admitted that prior searches of Black on his way into E.C.H.C. had failed to reveal a single instance where any contraband items were found.

During the hearing, the court attempted to determine if different procedures could be set forth for visits by defendants to the facility. The only other rooms available for a meeting were the usual visitors' rooms, arrived at through the front entrance to the E.C.H.C. The court has determined that these facilities would be inadequate for a meaningful conference between codefendants.

## CONCLUSIONS

The defendants do not contest the fact that Black, who is proceeding pro se in the state criminal cases, has the right to confer with codefendants and witnesses who are housed in the E.C.H.C. in order to prepare his defense. For his part, Black does not dispute the right of the defendants to require a pat-down search, search of briefcases or other reasonable measures to assure the security of the jail facility. The bone of contention is the requirement that Black submit to a strip search before conferring with inmates in the E.C.H.C.

■ A strip search of a visitor is a degrading and embarrassing experience and should be permitted only when other less offensive measures would not render the facility secure. The fourth amendment to the Constitution provides that all citizens shall be secure in their persons from unreasonable searches. Generally speaking, any search made without a warrant is deemed to be presumptively unreasonable and a violation of a constitutional right. The burden is upon the state to demonstrate the reasonableness of the intrusion under the surrounding circumstances, and point to specific facts justifying a transgression of the type proposed. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

Both parties urge the court to consider the cases of strip searches conducted at border crossings and adopt the standards enunciated in the cases of United States v. Henderson, 390 F.2d 805 (9th Cir. 1967); United States v. Guadalupe-Garza, 421 F.2d 876 (9th Cir. 1970); United States v. Carter, 480 F.2d 981 (9th Cir. 1973). The purpose of a border search and the search of persons entering a jail facility are similar. In both cases, the aim is to prevent contraband and other prohibited material from entering. Before a strip search is permitted at the border, however, the Customs official must harbor a "real suspicion"—something more than a "mere suspicion"—directed at the person to be searched. United States v. Henderson, *supra.* "Real suspicion" was defined in the following manner:

> "Real suspicion" justifying the initiation of a strip search is subjective suspicion supported by objective, articulable facts that would reasonably lead an experienced, prudent customs official to suspect that a particular person seeking to cross our border is concealing something on his body for the purpose of transporting it into the United States contrary to law.

> The objective, articulable facts must bear some reasonable relationship to suspicion that something is concealed on the body of the person to be searched; otherwise, the scope of the search is not related to the justification for its initiation, as it must be to meet the reasonableness standard of the Fourth Amendment. (Citations omitted.)

United States v. Guadalupe-Garza, *supra,* at 879.

■ In this case, the "objective facts" show that prior to Black's November marihuana arrest which, in this proceeding, has no probative effect, he was not required to submit to a strip search. Furthermore, the defendants knew of his prior felony record for some time and were also aware of the pending felony charges against him. In

**92**

spite of this knowledge, he was permitted to enter the E.C.H.C. with only a pat-down search. No contraband material was ever found on Black before any of his conferences in the E.C.H.C. or afterwards upon persons with whom he met.

The defendants have failed to support the allegation that contraband has been introduced into the facility by visitors. The material brought into the court, for the most part, originated in the E.C.H.C. itself. The other materials dubiously termed contraband, of outside origin, could not, under any theory presented to the court, pose a danger to the security of the institution. Furthermore, it appears that the materials of outside origin came in through normal E.C.H.C. procedures. Therefore, under all the circumstances, the defendants have failed to show, as the proffered test requires, that there is a "real suspicion" of contraband introduction which could possibly be attributed to Black. *Compare* United States v. Carter, *supra*. *See also* Gettelman v. Werner, 377 F.Supp. 445 (W. D.Pa.1974).

Furthermore, there are a number of economical alternative plans less offensive to the fourth amendment which the defendants could institute to prevent the introduction of contraband, if that was really a problem. The conference rooms can be visually observed by deputies and the conferees can be separated in a manner which would make the passage of contraband difficult, if not impossible. In addition to the pat-down searches, the defendants could install metal detecting devices, and continue to search inmates who are within their custody after meetings with visitors.

For these reasons, the court orders a preliminary injunction to issue granting the plaintiff Black the right to enter the E.C.H.C. for the purpose of conferring with persons necessary to the preparation of his defense, without submitting to a strip search, unless the defendants are able to articulate a real suspicion as defined in this decision. Defendants may continue to require a pat-down search, removal of outer clothing, the emptying of pockets, screening by a metal detection device or other device which does not require disrobing, and the inspection of papers, bags, books or other items carried into the E.C.H.C. The defendants shall conduct the searches described in a manner least likely to embarrass or delay the passage of the plaintiff Black into the facility.

So ordered.