Shirley COLE, et al., Plaintiffs,

v.

Linwood SNOW, et al., Defendants.

No. CA 77–1351–T.

United States District Court, D. Massachusetts.

May 9, 1984.

Jeffrey W. Kobrick, Charles R. Capace, Boston, Mass., for plaintiffs.

Francis J. O'Rourke, Hale, Sanderson, Byrnes & Morton, Boston, Mass., for Snow, Higgins & Plymouth County.

Paul Sullivan, Scituate, Mass., for Snow & Higgins.

Alexander Gray, Asst. Atty. Gen., Boston, Mass., for Hall.

## OPINION

TAURO, District Judge.

Plaintiff, Ruth McCarthy Blackburn, brought this action under 42 U.S.C. § 1983 (1981), seeking compensatory and punitive damages for alleged violations of her constitutional rights arising out of a strip search policy instituted at the Plymouth House of Corrections ("Plymouth").[1] Pursuant to that policy, Ms. Blackburn was strip searched three times during April 1977, while attempting to visit her brother, Richard McCarthy.[2] Defendants are Plymouth County and Sheriff Linwood Snow. The latter was sued both in his official capacity and as an individual.[3]

During a nine day bench trial, the court heard testimony from the named parties as well as from: Dr. Stuart Grassian, a psychiatric expert retained by plaintiff;[4]

1. Originally plaintiff also sought injunctive relief. On October 11, 1978, the parties entered into a consent decree that permanently modified Sheriff Snow's strip search order, thus mooting plaintiff's claim for injunctive relief.

2. The complaint originally named as plaintiffs both visitors (Ruth McCarthy Blackburn, Shirley Cole) and inmates (Peter Enos, Robert E. Maness, Jr., Paul Schmidt, Richard McCarthy). The inmates, who are no longer incarcerated at Plymouth, sought only injunctive and declaratory relief. Because of the consent decree, *see supra* note 1, their claims are now moot. No evidence was presented on behalf of Shirley Cole's claims. Her claims, therefore, are dismissed.

Originally, the complaint designated a class of plaintiffs consisting of all inmates and visitors who were affected by the strip search policy. The court denied plaintiffs' motion for class certification on November 8, 1979.

3. Plymouth County was added as a defendant pursuant to a motion allowed by the court on

June 25, 1980. The court allowed the motion in light of *Owen v. City of Independence Mo.,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

The complaint also named as a defendant the Deputy Master of Plymouth at the time of the strip searches, Whitman Higgins. The claims against him were voluntarily dismissed with prejudice on January 10, 1983.

The claims set out in the second amended complaint against the Commissioner of the Massachusetts Department of Corrections, Frank A. Hall, were voluntarily dismissed without prejudice on March 18, 1981.

A companion case, *Doreen Veracka et al. v. John J. Buckley et al.,* No. 77–2286–T (D.Mass.), concerning the Middlesex County jail, was settled and voluntarily dismissed on August 24, 1978.

4. Defendants have moved jointly to strike or disregard the testimony of Dr. Grassian. Defendants contend that Dr. Grassian's testimony constituted hearsay. The defendants' motion is without merit and is denied.

Dr. Norman Zinberg, a psychiatric expert retained by the defendants; Joseph M. Cannon, an expert on prisons; and Richard Warren, a Barnstable High School Guidance Counselor.[5] After an extended post-trial briefing and conference schedule, the case was taken under advisement.

## I

### THE FACTS

Richard McCarthy was transferred from Barnstable County Jail to Plymouth in January 1977. He was placed in a 23-hour a day lockup from the outset and had virtually no visitors other than his sister, Blackburn, who saw him on a weekly basis.

Prior to March 1977, visits to Plymouth were subject to strict security procedures. Visitors were required to undergo pat-down searches, as well as metal detector inspections. Personal possessions were banned from the visiting room. That room was supervised by guards and monitored by a television system that exposed ninety percent of the visiting area. All inmates were subject to strip searches after visits.

Notwithstanding these security precautions, Snow believed that the visiting area could not be monitored adequately. In April 1977, he, therefore, ordered that all visitors, children and babies included, be strip searched prior to entering the visiting room. Visitors could not avoid the strip search by opting for a non-contact visit.[6]

The Sheriff did not specify the procedures to be used in the searches, nor where they were to be conducted. He anticipated that they would include visual and contact inspection of body cavities, including the rectum and the vagina. Sometime after

the policy had been implemented, he became aware that female matrons were conducting strip searches of female visitors in a small hallway next to a rest room.

Pursuant to Snow's order, Blackburn was required to submit to a thorough strip search on three occasions when she sought to visit her brother in April 1977. On the first occasion, a matron directed Blackburn to a small room and instructed her to remove all of her clothing. The matron then checked Blackburn's ears and looked down her throat using a "stick" and a small flashlight. The matron examined Blackburn's hair, looked in her armpits and lifted her breasts to inspect underneath them for contraband. The matron required Blackburn to turn toward a wall and stand "spread eagled" while the matron conducted a visual inspection of Blackburn's anus.

On the second visit, during which she was accompanied by her brother Mathew, a different matron inspected Blackburn. Blackburn testified that this matron "was much more gruff and seemed hostile toward me, and she seemed to be enjoying what she was doing." This matron lifted Blackburn's breasts, "twice on each side," and manually spread Blackburn's buttocks.

At the conclusion of their visit, Blackburn and Mathew were walking across the Plymouth lawn. Snow, accompanied by another person, directed them to stop. He told them that they were not to cross the lawn. He also expressed his concern that, if visitors were permitted to do so, they might drop contraband on the lawn for the inmates to retrieve later.

Blackburn, who had had no prior contact with Snow, responded that she had no intention of leaving contraband on the lawn.

---

5. The court also heard testimony by Ms. Sandra Raymond, a former correction officer at Plymouth. Ms. Raymond, however, refused to submit to cross-examination. Her direct testimony will, therefore, be disregarded.

6. Sheriff Snow issued the strip search order in response to an incident in which an inmate who had taken valium without medical authorization attempted to assault a prison guard. At the time of the assault, Plymouth dispensed valium to inmates. No evidence was offered tying the

valium incident to visitors. Indeed, examination of the "Incident Reports" of irregularities at Plymouth between 1974 and 1977, when plaintiff ceased her visits, indicates that visitors were involved in very few drug or weapon related incidents. Joseph Cannon, plaintiff's prison expert, after reviewing the Incident Reports, testified that he "was very surprised to find the few reports and the lack of seriousness of these reports over that period of time."

Snow in turn told her: "Well, I don't want to see your face around here anymore." Although Blackburn understood Snow's admonition to mean that she should not walk across the lawn during future visits, his intention was to inform her that she was prohibited from visiting her brother in the future.[7]

Blackburn returned to Plymouth in late April, intending to visit her brother Richard, and was subjected to a third strip search.[8] Pursuant to Snow's order, however, she was not permitted to visit her brother.

## II

## CLAIMS

█ Plaintiff claims that the strip searches violated her constitutional rights under the first, fourth, and fourteenth amendments to the United States Constitution. First, she claims that the blanket strip search policy infringed on her first and fourteenth amendment right to communicate and associate with her brother.[9] Second, plaintiff claims that the strip searches violated her right to be free of unreasonable searches under the fourth and fourteenth amendments to the Constitution. She claims that the strip searches resulted in damages including: severe depression; sexual dysfunction; and posttraumatic stress syndrome.

7. In his testimony Sheriff Snow acknowledged that he did not give Blackburn formal notice that she was barred from visiting her brother.

8. No details of that search were offered in evidence.

9. In her Post Trial Brief Blackburn raises for the first time a claim for damages due to Snow's permanently banning her from visiting her brother. This claim was not raised in her complaint, nor in the motion to amend the complaint. This court views plaintiff's discussion of the issue as a motion to amend the complaint to conform to the evidence, pursuant to Federal Rules of Civil Procedure 15(b). The court finds, however, that evidence pertaining to damages on this issue was not presented at trial. The motion, therefore, is denied.

█ In response, Snow asserts that he is not liable because he acted in good faith when he instituted the strip search policy. Defendant Plymouth County contests liability on both procedural[10] and substantive grounds. The county relies primarily on plaintiff's alleged failure to present any evidence during the trial addressing the county's liability. Additionally, the county claims that, although the Supreme Court has allowed the imposition of liability on counties, *see Owen v. City of Independence Mo.*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), such liability may not be imposed in the instant case because the county was not involved in Sheriff Snow's decision to institute the strip search policy. Further, the county argues that regulation of county jails in Massachusetts is a function of the state, not of the county.

Both Sheriff Snow and Plymouth County contend that Blackburn consented to the search, and cannot now claim that her constitutional rights were violated. Additionally, both defendants dispute that Blackburn suffered any damages.

## III

## ELEMENTS OF LIABILITY

Section 1983 provides that any person who acts under color of state law to deprive another of a constitutional right may be required to pay money damages. 42

10. Defendant Plymouth County has also moved for judgment in its favor on the ground of insufficiency of service of process under Rule Four of both the Federal and Massachusetts Rules of Civil Procedure. The court finds that the process in the instant case conformed with the requirements of both rules. Because plaintiff has sued the Sheriff in his official capacity, as well as individually, the action is deemed to be a suit against the county without the necessity of formally joining the county as a party defendant. *See Monell v. Dept. of Social Services of New York,* 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978) ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent ...."); *Familias Unidas v. Briscoe,* 619 F.2d 391, 403 (5th Cir. 1980).

U.S.C. § 1983.[11] To recover under this section Blackburn must demonstrate, by a preponderance of the evidence, that the strip search deprived her of a constitutionally protected right, that one or both defendants are legally responsible for that deprivation, and that such deprivation was the proximate cause of her injury. *See Rogers v. Okin,* 478 F.Supp. 1342, 1381 (D.Mass. 1979), *aff'd in part and reversed in part on other grounds,* 634 F.2d 650 (1st Cir. 1980), *judgment vacated by* 457 U.S. 291, 102 S.Ct. 2442, 73 L.Ed.2d 16 (1982).

■ Federal courts have repeatedly expressed their reluctance to interfere with the operation of state prisons. *See, e.g., Procunier v. Martinez,* 416 U.S. 396, 404, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974); *Hodges v. Klein,* 412 F.Supp. 896, 899 (D.N.J.1976). When a claim of constitutional dimension is raised, however, the law requires courts to consider the issue. *See Procunier v. Martinez,* 416 U.S. at 405, 94 S.Ct. at 1807 ("[A] policy of judicial restraint cannot encompass any failure to take cognizance of valid constitutional claims ....."). *See also United States v. Chamorro,* 687 F.2d 1, 2 (1st Cir.), *cert. denied,* 459 U.S. 1043, 103 S.Ct. 462, 74 L.Ed.2d 613 (1982).

Two constitutional issues are present in this case. The first is whether the first amendment guarantees a right to communicate and associate with incarcerated rela-

tives. The second is to what extent the fourth amendment protects visitors to prisons against being subjected to strip searches.

A. *The First Amendment Issue*

■ In *Procunier v. Martinez,* the Court held that a prison regulation permitting censoring of inmates' mail violated the first amendment rights of both the prisoners and their outside correspondents. *Id.* at 418, 94 S.Ct. at 1814. The Court relied on the fact that the regulation did not have the redeeming quality of furthering the government's substantial interest in ensuring security and order within a prison setting. Although, unlike the situation in *Martinez,* the policy of strip searching all visitors to Plymouth was clearly directed toward the goal of preserving internal security, the question remains as to whether its impact was unnecessarily broad.

> [T]he limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved. Thus a restriction on inmate correspondence that furthers an important or substantial interest of penal administration will nevertheless be invalid if its sweep is unnecessarily broad.

*Id.* at 413–14, 94 S.Ct. at 1811.[12]

The Court in *Martinez* also noted that "[w]hile not necessarily controlling, the pol-

---

**11.** Section 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

**12.** In *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), the Supreme Court also addressed a first amendment challenge to a prison regulation. There, the Court held that the challenged regulation, which prohibited "[p]ress and other media interviews with specific individual inmates ..." *id.* at 819, 94 S.Ct. at 2802, did not violate the first amendment rights of the inmates or the press. *Id.* at 828, 835.

First, the Court held that an inmate in prison retained only "those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Id.* at 822, 94 S.Ct. at 2804. Second, the Court found that the limitation on press interviews did not violate the media plaintiffs' first amendment rights. Neither strand of the *Pell* holding is applicable to the instant case. This case does not present a challenge by a prisoner. The arguably lower standard for reviewing a prisoner's first amendment challenge does not, therefore, apply here. Additionally, this case does not involve the rights of media plaintiffs. The language in the second half of the *Pell* holding is limited to the issue of press access to prisoners.

Even if this court were to find that the holding in *Pell* is applicable to a case brought by a visitor, the regulation involved in the instant case presents a stronger first amendment chal-

icies followed at other well-run institutions would be relevant to a determination of the need for a particular type of restriction." 416 U.S. at 414 n. 14, 94 S.Ct. at 1812. Defendants offered no evidence of any other institution that has a policy of strip searching all visitors.

The strip search policy instituted at Plymouth was unnecessarily broad. More reasonable and yet equally effective alternatives were available to Snow. For example, searches could have been limited to contact visits. Additionally, a policy of strip searching visitors whom prison authorities had probable cause to search would have been less intrusive.[13]

In light of the overbreadth of the strip search policy, and the lack of a non-contact visit alternative by which plaintiff could have visited her brother and not been strip searched, this court finds that the strip search policy violated her first amendment rights.

### B. The Fourth Amendment Issue

■ The fourth amendment proscribes unreasonable searches and seizures. *See Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). To assure the reasonableness of searches and seizures, usually both a warrant and probable cause are required. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973). If an individual voluntarily consents to be searched, however, it is not a search within the meaning of the fourth amendment and these requirements do not apply. In this case defendants con-

tend that plaintiff voluntarily consented to being strip searched and, therefore, that no fourth amendment violation occurred.

■ Contrary to defendants' contention, this court finds that Blackburn did not voluntarily consent to be strip searched. An individual whose right to visit a prison inmate is conditioned on her submission to a strip search is subjected to a "search" within the meaning of the fourth amendment. The mere fact that she submits to the search does not render it "voluntary" where her consent is given in "inherently coercive circumstances." *See Palmigiano v. Travisono*, 317 F.Supp. 776, 792 (D.R.I. 1970).[14]

■ Putting the issue of consent to one side, defendants' fall back position is that the searches were "reasonable." The fourth amendment proscribes only unreasonable searches and seizures. *See Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. at 1879. The term "reasonable" must be assessed having in mind "all the circumstances of the particular governmental invasion of a citizen's personal security." *Id.* at 19, 88 S.Ct. at 1878. Specifically, "[t]he scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." *Id.* quoting *Warren v. Hayden*, 387 U.S. 294, 310, 87 S.Ct. 1642, 1651, 18 L.Ed.2d 782 (1967).

The Supreme Court has held that, in evaluating the reasonableness of a search, a court must balance "the need for the particular search against the invasion of personal rights that the search entails." *See Bell v. Wolfish*, 441 U.S. 520, 559, 99

---

lenge than the regulation involved in *Pell.* The Court in *Pell* noted that the regulation of press interviews did not "seal the inmate off from personal contact with those outside the prison." *Id.* at 824, 94 S.Ct. at 2805. In the instant case, visitors could not avoid strip searches by opting for a non-contact visit. *See supra* at 4. The instant regulation could, therefore, prevent the inmates from having any personal contact with visitors.

**13.** This court does not decide that such a policy would be constitutional. It is worth noting that the Supreme Court has instructed lower courts to consider less restrictive alternatives in the context of the first, but not the fourth amend-

ment. *See Bell v. Wolfish*, 441 U.S. 520, 559 n. 40, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). (in the context of the fourth amendment: "less-restrictive-alternative arguments could raise insuperable barriers to the exercise of virtually all search-and-seizure powers.") This court need not and does not find that prisoners and their visitors have a constitutional right to contact visits. *See Feeley v. Sampson*, 570 F.2d 364, 373 (1st Cir.1978).

**14.** The argument is all the more persuasive here where visitors to the prison did not have the option of avoiding the strip search by electing to have a non-contact visit.

S.Ct. 1861, 1884, 60 L.Ed.2d 447 (1979). Specifically, a court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Id.*

The extremely intrusive impact of strip searches that include even visual inspection of body cavities is well recognized by the courts today. *See Bell v. Wolfish,* 441 U.S. 520, 560, 99 S.Ct. 1861, 1885, 60 L.Ed.2d 447; *Arruda v. Fair,* 710 F.2d 886, 887 (1st Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983); *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982); *Black v. Amico,* 387 F.Supp. 88, 91 (W.D.N.Y. 1974). Moreover, the manner in which strip searches are conducted is "of course, as vital a part of the inquiry as whether [the searches] were warranted at all." *See Terry v. Ohio,* 392 U.S. at 28, 88 S.Ct. at 1883; *see also Schmerber v. California,* 384 U.S. 757, 772, 86 S.Ct. 1826, 1836, 16 L.Ed.2d 908 (1966) ("That we today hold that the Constitution does not forbid the States [sic] minor intrusions into an individual's body under stringently limited conditions in no way indicates that it permits more substantial intrusions, or intrusions under other conditions.")

■ The searches of Blackburn were not merely visual searches, but involved the manipulation of her breasts and buttocks. The searches were conducted in an atmosphere of marginal privacy. Furthermore, these searches were undertaken by personnel who had received no training or guidance as to how or where the searches were to take place. In light of these flagrant deficiencies, this court finds that the strip searches of Blackburn violated her fourth amendment rights.

In their effort to justify these searches, defendants offered no evidence that would even suggest that Blackburn was carrying contraband. Clearly, she was not a legitimate target of suspicion. The question remains, however, whether the overall visitor experience at the institution justified implementation of a blanket strip search policy. Relevant to that inquiry is an examination of the frequency of incidents involving visitors and the adequacy of security prior to the institution of the policy.

In his testimony, prison expert Joseph Cannon compared the number and nature of visitor incidents at Plymouth with those at other correctional institutions. Cannon testified that when Snow instituted his policy of strip searching visitors, there had been very few contraband incidents involving visitors, and that even those were not of a serious nature.

In addition, Plymouth had strict security procedures. Even before the strip search policy was instituted, two guards were always present in the visiting room whenever Blackburn visited her brother. The room was monitored by television cameras. Inmates were subject to strip searches after visits. That program was adequate to assure that attempted transfers of contraband would probably be detected. The implementation of a blanket visitor strip search policy was an unnecessary, overbroad and impermissibly intrusive step that violated plaintiff's constitutional rights.

## IV

## PROFFERED DEFENSES

■ Having determined that plaintiff's constitutional rights were violated, this court must next determine whether either or both defendants are liable for any injury that she may have incurred.

### A. *Sheriff Snow*

Courts have consistently construed section 1983 as preserving some degree of immunity for government officials. *Procunier v. Navarette,* 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978).[15] In *Navarette,* the Supreme Court held that prison officials were not absolutely immune

---

**15.** For example, legislators, judges and prosecutors have been held absolutely immune from liability for damages under section 1983. *Pro-*

*cunier v. Navarette,* 434 U.S. at 561, 98 S.Ct. at 859.

from liability in section 1983 actions, but that they were entitled to a "qualified immunity" defense. *Id.* at 561, 98 S.Ct. at 859.

The standard to be applied in determining whether a qualified immunity defense is justified was provided by the Supreme Court in the case of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982):

> [G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738.[16] This court, therefore, must review the state of the law in 1977, the time that Snow enacted the strip search policy, to determine whether his actions violated clearly established constitutional rights of which he should have been aware.[17]

Almost ten years before Sheriff Snow instituted the strip search policy at Plymouth, the Supreme Court had emphasized the intrusiveness of even a pat-down search. *See Terry v. Ohio,* 392 U.S. at 17, 88 S.Ct. at 1877 ("It is a serious intrusion upon the sanctity of a person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly.") It was equally well established in 1977 that constitutional protections exist within the walls of correctional facilities. *See Wolf v. McDonnell,* 418 U.S. 539, 555–56, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974) ("There is no iron curtain drawn between the Constitution and the prisons of this country.") Courts had also made it clear that even prisoners maintained at least some fourth amendment rights. *See Lanza v. New York,* 370 U.S. 139, 143–44, 82 S.Ct. 1218, 1220–21, 8 L.Ed.2d 384 (1962); *Palmigiano v. Travisono,* 317 F.Supp. at 791 (holding that indiscriminately opening and reading all prison mail violated rights of both pretrial detainees and convicted prisoners.)[18]

Until now, no court has considered a strip search policy as sweeping as the one challenged here. In 1974, however, the Western District of New York enjoined the strip search of a visitor plaintiff. In *Black v. Amico,* 387 F.Supp. 88, the plaintiff, a visitor to the Erie County Holding Center brought an action against a sheriff and jail officials to prevent them from requiring him to submit to a strip search prior to visiting an inmate. The plaintiff in *Black* had a record of felony convictions, which the superintendent of the prison testified was the basis for requiring the strip search. *Id.* at 90. The court in *Black* held that the holding center could not require a visitor to submit to a strip search absent a "real suspicion." *Id.* at 92. In imposing a "real suspicion" standard, the court applied the test used in evaluating searches at border crossings. *See, e.g., United States v. Carter,* 480 F.2d 981, 982 (9th Cir.1973); *United States v. Guadalupe-Garza,* 421 F.2d 876, 879 (9th Cir.1970); *United States v. Henderson,* 390 F.2d 805, 808 (9th Cir. 1967).

The analytical similarities of border searches and prison strip searches were

---

**16.** Although *Harlow* concerned the qualified immunity of federal officials, the Court noted that "it would be 'untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.'" *Harlow,* 457 U.S. at 818 n. 30, 102 S.Ct. at 2739 *quoting Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978).

**17.** The Supreme Court stated that it was limiting "[j]udicial inquiry into subjective motivation . . . ." *Id.* at 817, 102 S.Ct. at 2738. It is unclear whether the Court intended to abolish all inquiry into the subjective motivation of the defendant. Assuming that the issue of subjective knowledge is still a part of the qualified immunity defense, this court finds that the evidence did not establish that Snow *knew* that his actions violated clearly established constitutional rights.

**18.** The court in *Palmigiano* did note that this was an area of "evolving law." 317 F.Supp. at 792. As noted above, however, the court was considering the rights of prisoners and not free members of the society visiting the jail.

also recognized in *Hodges v. Klein*, 412 F.Supp. at 902 ("[S]ome instructive parallels exist between the prison guard and the customs officer."). *See also Arruda v. Fair* at 890 (dissent); Note, *Constitutional Limitations on Body Searches in Prison*, 82 Colum.L.Rev. 1033, 1048–49 (1982). In *Hodges*, while upholding strip searches of prisoners following visits, the court concluded that the state could not conduct a visual anal search of an inmate "unless there is a reasonably clear indication or suggestion that the inmate is concealing something in his anal cavity." *Id.* at 903.[19]

The judicially articulated similarities between border search cases and strip searches in prison strongly suggested that "real suspicion" was required. Additional analogous precedent existed in cases challenging strip searches in schools. *See Picha v. Wielgos*, 410 F.Supp. 1214 (N.D.Ill. 1976) (holding school officials liable in damages for strip search of high school student). Finally, a federal case challenging a visitor strip search had found that the search violated the visitor's fourth amendment rights. *See Black v. Amico*, 387 F.Supp. 88. In 1977, there was ample case law that should have put Sheriff Snow on notice that a policy of strip searching visitors, without any cause to suspect that they were carrying contraband, was unconstitutional.

### B. *Plymouth County*

Municipalities are no longer immune from suit under 42 U.S.C. § 1983. *Monell v. Department of Social Services of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To find liability against a municipality, a court need not find that the offending policy was adopted by the municipality's leaders—in this case the County Commissioners. A court may find that the government, as an entity, is liable under § 1983 for damages when an individual whose "edicts or acts may fairly be said to represent official policy inflicts the injury ...." *Id.* at 694, 98 S.Ct. at 2037.

Sheriff Snow acted for the county in administering the Plymouth House of Corrections. Massachusetts General Laws Annotated chapter 126 § 16 (1979) provides in pertinent part:

> The sheriff shall have custody and control of the jails in his county, and except in Suffolk County, of the houses of correction therein, and of all prisoners committed thereto, and shall keep the same himself or by his deputy as jailer, superintendant or keeper, and shall be responsible for them.

*Id.*

Snow was also superintendent of prisons for Plymouth County. It is the responsibility of the superintendents of houses of correction, "to maintain order in the institutions under their supervision, [and] enforce obedience ...." Mass.Gen.Laws Ann. ch. 127 § 33 (1979). Finally, the legislature has given the sheriffs complete control over who may or may not visit prisons. *See* Mass.Gen.Laws Ann. ch. 127 § 36 (1974).

In *Owen v. City of Independence, Mo.*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673, the Supreme Court held that municipalities, unlike government officials, are not entitled to assert a defense of qualified immunity from liability in section 1983 ac-

---

19. *Hodges v. Klein*, because it concerned a prisoner strip search is distinguishable from the instant case. In 1979, in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447, the Supreme Court held that visual body cavity inspections of prisoners or pretrial detainees, if conducted in a reasonable manner, do not violate the Constitution. *Id.* at 558, 99 S.Ct. at 1884. Prior to *Bell v. Wolfish*, some courts had suggested that strip searches even of prisoners were unconstitutional or should be strictly lim-ited. *See, e.g., Daughtery v. Harris*, 476 F.2d 292, 295 (10th Cir.1973) (allowing strip searches under "judicious" circumstances); *Frazier v. Ward*, 426 F.Supp. 1354 (N.D.N.Y.1977) (disallowing strip searches after contact visits). Although *Bell v. Wolfish* resolved the question of the constitutionality of reasonable strip searches of prisoners, that the propriety of even prisoner strip searches was unclear in 1977 suggests that Snow should have been aware that a policy of strip searching all visitors was unconstitutional.

tions. *Id.* at 638, 100 S.Ct. at 1409.[20] The Court explained that if municipalities were permitted to assert a good faith defense, "many victims of municipal malfeasance would be left remediless ...." *Id.* at 651, 100 S.Ct. at 1415. The Court noted further that "the threat that damages might be levied against the city may encourage those in a policymaking position to institute internal rules and programs designed to minimize the likelihood of unintentional infringements on constitutional rights." *Id.* at 652, 100 S.Ct. at 1416. (footnote omitted).

Plymouth County argues that its lack of involvement in running the prison distinguishes this case from *Owen.* The county's argument is unpersuasive. The Court made clear that,

> the threat of liability against the city ought to increase the attentiveness with which officials at the higher levels of government supervise the conduct of their subordinates. The need to institute system-wide measures in order to increase the vigilence with which otherwise indifferent municipal officials protect citizens' constitutional rights is, of course, particularly acute where the frontline officers are judgment-proof in their individual capacities.

*Id.* at 652 n. 36, 100 S.Ct. at 1416.[21]

This court finds, therefore, that Plymouth County is also liable for the strip searches of plaintiff.

## V

## DAMAGES

Having determined that both defendants Sheriff Snow and Plymouth County are liable to Blackburn, this court must turn to the calculation of damages. Blackburn asks this court to award her compensatory damages for the pain and trauma that she experienced during the three strip searches, and for her suffering as a result of the strip searches. Additionally, she seeks punitive damages.

### A. *Compensatory Damages*

██ Under section 1983, Blackburn is entitled to compensation for economic harm, pain and suffering, mental and emotional distress, as well as any other losses that result from the violations of her rights. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

In evaluating Blackburn's claim for damages, it is useful to describe her condition prior to and following the strip search incidents. Blackburn's father, an alcoholic, repeatedly beat her mother and brothers, but she was spared that abuse. Due to the way her father singled her out for favorable treatment, the other family members viewed her as someone special, "a kind of caretaker." She developed a sense of guilt because of the special treatment that she enjoyed. This feeling of guilt was exacerbated by several incidents during which her father sexually molested her. Blackburn blamed herself for these incidents.

Blackburn's sense of guilt led her to be ashamed about her body. This emotional reaction was aggravated when she physically matured earlier than her peers. She developed large breasts and began to habitually walk with her arms crossed in front

**20.** In *Owen* the plaintiff named the city of Independence, the City Manager and the members of the City Council in their official capacities as defendants in a wrongful discharge suit. By the time the case reached the Supreme Court, only the liability of the municipality itself was at issue, not that of its officers. *Id.* at 638 n. 18, 100 S.Ct. at 1409.

**21.** In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court held that plaintiffs—individuals and organizations—could not recover against defendants, the Mayor of Philadelphia and the Police Commissioner, for a "pattern" of police misconduct. The Court found that without a showing of direct responsibility, defendants' failure to act in the face of a statistical pattern was not enjoinable under § 1983. *Rizzo,* however, concerned the scope of federal equity power, not the scope of municipal immunity from suit. Additionally, *Rizzo* concerned a "pattern" of constitutional violations, while the instant case involves a policy that violated the constitution. The Court in *Rizzo* emphasized that "a statistical pattern" is "quite dissimilar" to a "deliberate plan." *See id.* at 375, 96 S.Ct. at 606.

of her chest. She became so frightened about being seen naked that, despite her general record of good grades, she failed her high school physical education class because of her unwillingness to use a common shower. Additionally, prior to the time of the strip search, Blackburn had never actually let her body be seen naked, even by a man with whom she was sexually involved. As a result of her family history, Blackburn was extremely vulnerable to the potentially adverse consequences of an unwanted and intrusive strip search.

Despite her psychological sensitivities just prior to the strip searches, Blackburn had begun to adjust to life as an independent adult. She had her own apartment, was in her fourth semester at college and was involved in her first sexual relationship, which began a few months before the strip searches.[22]

During the strip searches, Blackburn experienced what Dr. Grassian termed as "derealization." The strip searches seemed unreal to her. She panicked, perspired heavily and shook uncontrollably to the extent that she was barely able to stand. She found the experiences to be traumatic, and repressed the memories of them.

■ Following the strip searches, Blackburn developed symptoms of post-traumatic stress syndrome. She regressed, becoming guilt ridden and depressed. She gained approximately forty pounds, had nightmares about the strip searches and had trouble sleeping. She also became phobic about sex. Shortly after the strip searches, Blackburn ended her sexual relationship. She stopped working, attempted suicide, and eventually dropped out of college, which she was within months of finishing. She never returned to school.[23]

After Blackburn's relationship ended, she became involved with a man whom she eventually married. When she attempted to have sexual relations with this man she experienced muscle spasms, rigidity and physical pain. The symptoms of sexual dysfunction continued throughout her marriage. She had never experienced these physical reactions prior to the strip searches. Dr. Grassian testified, and this court finds, that the physical and psychological problems that plaintiff experienced following the strip searches were directly caused by the strip searches.

■ The symptoms that the strip searches caused have, to date, "never really lifted in any substantial way." Dr.

---

**22.** At Tr. 3–16 the transcript reads "[plaintiff] was involved in her first romantic relationship, which had begun a few months after the strip searches." Dr. Grassian testified that the word "after" should be "before" and that the quote at Tr. 3–16 was a transcription error. Tr. 9–101.

**23.** The court reserved the question of the admissibility of a portion of plaintiff's diary, marked Plaintiff's Exhibit 2 for identification, until the parties filed their briefs. The exhibit was a poem that Ms. Blackburn wrote shortly after the strip searches. It supported plaintiff's testimony that she was depressed and it focused on her sexual relationship. The issue was whether the exhibit was admissible under Federal Rule of Evidence 801(d)(1)(B) as a prior statement that was "consistent with [her] testimony and is offered to rebut an express or implied charge against [her] of recent fabrication or improper influence or motive . . . ."

At the end of the trial when plaintiff's counsel offered the exhibit, defendant's counsel argued that he had never asked her any questions concerning her relationship. After reviewing the transcript and the briefs, this court finds that defendant's counsel did not examine Blackburn on the issue of her relationship. If the poem in the diary were directed solely to the issue of the relationship, then this court would not admit it into evidence. The poem, however, comes into evidence because it is a prior statement of plaintiff's depression. Defendant's counsel cross-examined Blackburn at length on the issue of her depression, implying that she was not severely depressed as a result of the strip searches. The poem, entitled "Spring Sunshine," reads:

"My hands reach out, still winter frozen
to touch your warmth
As I lift my head
to the carress [sic] of your smile
And all is fresh again, except me.
I chase you as you drift
through a tangle of youthful limbs
that clutch your fingers
and steal you from me
a little at a time.
Until all that's left is darkness
and myself . . .
frozen winter still."

Grassian predicted that, to alleviate the physical and psychological problems, Blackburn would need psychotherapy twice weekly for at least four years. He testified that the rate at the time of the trial was $60 to $70 per session of psychotherapy. Assuming that the rate was $65, and disregarding inflation, the cost over four years would be approximately $27,040.

In addition to awarding plaintiff $27,040 for her future medical costs, this court finds that she is entitled to $150,000 as compensation for the emotional and physical consequences of these unjustified strip searches.

### B. *Punitive Damages*

Punitive damages are available in appropriate circumstances in section 1983 actions. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 268, 101 S.Ct. 2748, 2760, 69 L.Ed.2d 616 (1981); *Rosado v. Santiago*, 562 F.2d 114, 121 (1st Cir. 1977). Courts will award punitive damages when aggravating circumstances indicate that the defendant acted with a malicious and wanton disregard of plaintiff's rights. *Rosado* at 121. The Supreme Court has held, however, that punitive damages are not available against municipalities. *City of Newport* at 271, 101 S.Ct. at 2762. The only question remaining, therefore, is whether the court should assess punitive damages against Sheriff Snow. Although the sheriff should have realized that his actions violated Blackburn's constitutional rights, this court finds that malice was not proved in the instant case and, therefore, punitive damages will not be awarded.

An order will ISSUE.