Lenora DAUGHERTY,
Plaintiff–Appellee,

v.

Donal CAMPBELL,
Defendant–Appellant,

Alton R. Hesson, Robert W. Starbuck, Funderburk, Rita A. Starbuck, Kevin W. Daniels, Bobby L. Chessor, Defendants.

No. 89–6008.

United States Court of Appeals,
Sixth Circuit.

Argued March 11, 1991.

Decided June 10, 1991.

Rehearing and Rehearing En Banc
Denied Aug. 27, 1991.

James L. Weatherly, Jr., John J. Hollins, Jr. (argued), Hollins, Wagster & Yarbrough, Nashville, Tenn., for plaintiff-appellee.

Kimberly J. Dean, Asst. Atty. Gen., Brenda Rhoton Little, Asst. Atty. Gen. (argued), Nashville, Tenn., for defendant-appellant.

Before KEITH and NELSON, Circuit Judges, and PECK, Senior Circuit Judge.

KEITH, Circuit Judge.

Defendant Donal Campbell ("Campbell") appeals from the district court's June 14, 1989, order denying summary judgment on the basis of qualified immunity in this action alleging violations of 42 U.S.C. § 1983, the fourth amendment and the fourteenth amendment. For the reasons set forth below, we AFFIRM the district court's order.

## I.

### A.

In 1982, the Tennessee Department of Corrections (the "Department") established guidelines governing the search of visitors to penal institutions (the "guidelines"). The Department's search policy required any official authorizing a visual body cavity search[1] of a visitor to make an affirmative finding of probable cause to believe that the visitor is concealing contraband prior to conducting the search.[2] On July

---

1. The term "strip search" generally refers to an inspection of a naked individual without scrutinizing the subject's body cavities. The term "visual body cavity search" refers to a visual inspection of a naked individual that includes the anal and genital areas. The term "manual body cavity search" refers to an inspection of a naked individual with some degree of touching or probing the body cavities. *See Blackburn v. Snow*, 771 F.2d 556, 561 & n. 3 (1st Cir.1985).

2. Section IV.B. of the Department's guidelines provides in pertinent part:

IV. *Policy:*
   B. Strip, visual body cavity, and/or manual body cavity searches of the persons of

22, 1986, Campbell, who was warden of the Turney Center Correctional Facility (the "Facility"), personally approved the Department's 1982 guidelines. Specifically, Campbell adopted the standard that a finding of probable cause must be made before a visual body cavity search of a prison visitor may be conducted.

Plaintiff Lenora Daugherty ("Daugherty") makes the following allegations in her pleadings.[3] On January 16, 1988, Campbell ordered security personnel at the Facility's visitors annex to conduct a visual body cavity search of her before permitting her to visit her husband. When Daugherty arrived at the Facility, two security guards instructed her that they were ordered to conduct a search of her vehicle as a precondition to granting her permission to visit her husband. The security officers initially were unable to search the vehicle because Daugherty had inadvertently locked her keys in the vehicle. The security officers than instructed Daugherty to enter the annex and submit to a visual body cavity search by another security officer. Daugherty complied and the visual body cavity search failed to produce contraband.

After the visual body cavity search, the security officers reinstated their request to search the vehicle before permitting Daugherty to proceed with her visit. Daugherty obtained entry of the vehicle by breaking the driver's side window. The security officers conducted a search of the vehicle which failed to produce contraband.

Next, Daugherty was instructed that permission to visit her husband was conditioned upon obtaining her signature on a standardized form indicating that she had consented to the vehicle and visual body cavity searches before they were conducted. Daugherty complied with this requirement.

### B.

On June 8, 1988, Daugherty filed suit against Campbell and several other prison officials. With respect to Campbell, Daugherty's complaint alleged that he ordered a visual body cavity search of her without first finding probable cause or reasonable suspicion that she possessed contraband. Daugherty claimed that Campbell's actions violated her rights under 42 U.S.C. § 1983 and the fourth and fourteenth amendments of the United States Constitution. On October 28, 1988, Campbell filed a motion for judgment on the pleadings and a stay of discovery. In its November 29, 1988, order, the district court referred all pretrial matters to a magistrate pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). In considering Campbell's motion, the magistrate reviewed the guidelines governing the search of visitors to penal institutions. These guidelines constitute evidence outside the pleadings, therefore, the defendant's motion was treated as a motion for summary judgment. After finding that, as a prison visitor, Daugherty had a clearly established fourth amendment right to be free of any search of her person

visitors and employees may only be conducted when they are specifically authorized as per the requirements of this policy regarding a particular person and shall only be authorized when there is *probable cause* to believe the person is concealing contraband. (Emphasis added).

Section V.A.5. of the Department's guidelines provides in pertinent part:

V. *Procedures:*
A. *Searching Visitors:*
5. In determining probable cause to the extent which warrants that a strip search, visual body cavity search, or a manual body cavity search be performed, the following factors should be first determined:
a. Source of information:
1. Received from outside Law Enforcement Agency.

2. Received from other Correctional Institutions.
3. Turney Center Staff.
4. Informant information, whether it be from free world informants or inmates informants, should be evaluated for credibility, utilizing the following criteria:
a. Credibility—Has informant's previous information been reliable? If so, how often?
b. Motive—What is informant attempting to gain by divulging information?
Appellee's Brief at Addendum B.

3. For the limited purpose of reviewing the district court's denial of the motion for summary judgment, we will state the facts as alleged by plaintiff, the nonmoving party.

absent a finding of reasonable suspicion by a prison official, the magistrate recommended denial of Campbell's motion for summary judgment on the issue of qualified immunity. The magistrate noted that the higher standard of probable cause, set forth in the guidelines, is not the proper legal standard to evaluate Campbell's conduct because Daugherty did not argue that the regulations created a fourth amendment liberty interest which was denied without due process.

The district court adopted the magistrate's report and recommendation on June 15, 1989 and denied Campbell qualified immunity with respect to the strip search issue. On July 14, 1989, Campbell filed a timely notice of appeal.

## II.

■ Although Campbell's appeal is interlocutory, we derive our jurisdiction to review the district court's order from 28 U.S.C. § 1291 which conveys appellate jurisdiction over appeals from "final decisions." "[A] district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985). Under the "collateral order" doctrine, a final decision under § 1291 may not be the last possible order made in a case. *Id.* at 524, 105 S.Ct. at 2814 (citation omitted). If the nature of the district court's decision is such that deferring appellate review to the conclusion of the proceedings would render the decision unreviewable, then § 1291 vests this court with jurisdiction to review the decision. *Id.* at 525, 527, 105 S.Ct. at 2814, 2816. Qualified immunity entitles its possessor to *"immunity from suit* rather than a mere defense to liability." *Id.* at 526, 105 S.Ct. at 2815 (original emphasis). The district court's decision to deny qualified immunity, like absolute immunity, is effectively unreviewable at the conclusion of the proceedings. *Id.* at 527, 105 S.Ct. at 2816. The district court's denial of Camp-

bell's claim of qualified immunity is therefore a final decision that is appealable at this juncture.

■ Whether qualified immunity is applicable to an official's actions is a question of law. *See id.* at 530, 105 S.Ct. at 2817; *see also Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir.1988). We therefore apply a de novo standard of review to this question. *Long v. Jones*, 929 F.2d 1111, 1114 (6th Cir.1991).

■ In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court held that "government officials performing discretionary functions[] generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 818, 102 S.Ct. at 2738. Reiterating the objective test, the Supreme Court stated in *Davis v. Scherer*, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984):

> *Harlow v. Fitzgerald* rejected the inquiry into state of mind in favor of a wholly objective standard.... Whether an official may prevail in his qualified immunity defense depends upon the "objective reasonableness of [his] conduct as measured by reference to clearly established law." No other "circumstances" are relevant to the issue of qualified immunity.

*Id.* at 191, 104 S.Ct. at 3017 (citations omitted). Before the commencement of discovery, a defendant pleading qualified immunity is entitled to dismissal if the plaintiff fails to state a claim of violation of clearly established law. *Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815. In using objective terms to define the limits of qualified immunity, the *Harlow* Court found that it is the district court's duty to determine, on a motion for summary judgment, the currently applicable law *and* whether that law was clearly established at the time the alleged action occurred. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. If the law was not clearly established, it is impossible to find that the defendant knew that the law forbade his or her conduct. *Id.* Under such

circumstances, it is unreasonable to expect an official to anticipate subsequent legal developments. *Id.* Government officials, therefore, are shielded from civil damages liability when "their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

■ In determining whether the law was clearly established at the time of the official's action, the *Anderson* Court advises:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful (citation omitted), but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 640, 107 S.Ct. at 3039. When conducting an inquiry to determine whether a constitutional right is clearly established, the law of our circuit requires us to look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to the decisions of other circuits. *Masters v. Crouch,* 872 F.2d 1248, 1251–52 (6th Cir.1989). In *Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171 (6th Cir.1988), we stated:

[I]n the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decision of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Id.* at 1177. *Seiter* found that the law was not clearly established regarding the relevant right. An examination of *Seiter* aids in clarifying the "contextual similarity required for the finding of a clearly established right." *Seiter,* 858 F.2d at 1176.

*Seiter* involved a challenge to Ohio prison officials' practice of conducting strip and body cavity searches on prison employees. The Ohio prison officials claimed that they were entitled to qualified immunity because the fourth amendment right to be free of these searches was not clearly established at the time of the officials' actions. The district court denied the officials' claim of qualified immunity based on *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The district court reasoned that *Katz* provides a per se rule of unlawfulness of any warrantless search that does not fall within an articulated exception to the warrant requirement. Although neither the Supreme Court nor the this Circuit had ruled on the specific circumstances of strip and body cavity searches, the district court held that the existence of the per se rule clearly established that such searches were violative of the fourth amendment. This Court reversed the district court's ruling finding the link between the conduct in *Katz,* wiretapping, and the conduct in *Seiter,* strip and body cavity searches of prison employees, was so attenuated that *Katz* failed to provide "an authoritative, 'clearly established' rule forewarning the defendants ... on pain of personal liability." *Seiter,* 858 F.2d at 1177. In addition, the *Seiter* court found that the prison visitor cases were not "so sufficiently similar as to merit reasonable reliance upon them as a guide to proper conduct." *Id.*

■ Bearing the aforementioned principles in mind, we conclude that the district court properly denied Campbell's claim of qualified immunity because in January 1988 the search of prison visitors without at least reasonable suspicion violated clearly established law. In *Long v. Jones,* 929 F.2d 1111 (6th Cir.1991), we were confronted with a similar issue. The defendants in *Long* were wardens who, during 1984 and 1985, authorized strip searches or body cavity searches of the prison visitors. Much like Daugherty's experience, the prison

guards told the visitors that they would not be allowed to visit their husbands or fiances unless the visitors submitted to the searches. *Id.* at 1113. The visitors and their inmate-spouses or -fiances filed suit. The visitors alleged that the searches violated their fourth amendment rights to freedom from unreasonable searches and seizures. The inmates alleged that the wardens violated the inmates' fourteenth amendment liberty interest in visitation created by Tennessee prison regulations. The prison regulations provided that visiting rights could be suspended only for good cause. The regulations also required a prison official to have probable cause to believe that a prison visitor is concealing contraband before a strip search or a visual or manual body cavity search of the prison visitor could be authorized.

The wardens filed a motion to dismiss on the basis of qualified immunity. They claimed that they had a reasonable suspicion that the plaintiffs were smuggling contraband. They maintained that they did not violate clearly established law by conducting the search of the visitors based on their suspicion. The district court denied the motion to dismiss based on qualified immunity.

The *Long* court reversed the district court's denial of qualified immunity on the fourth amendment issue finding that "searches of prison visitors during 1984 and 1985 without *at least a reasonable suspicion* violated clearly established law, because a reasonable officer should have known that such searches would be found unconstitutional." *Long,* at 1116 (emphasis added). The *Long* plaintiffs, however, alleged only that the wardens lacked *probable cause* for their searches, not that the wardens lacked reasonable suspicion. *Id.* The plaintiffs, therefore, failed to plead a cause of action under the fourth amendment that could obfuscate the wardens' claim of qualified immunity because the asserted right of prison visitors to be free

from strip and body cavity searches without probable cause was not clearly established under the fourth amendment.[4]

The plaintiffs in *Long* invoked the higher probable cause standard. In the instant case, however, Daugherty's claimed violation is based on Campbell's authorization of a visual body cavity search without first finding either *reasonable suspicion* or probable cause that she was concealing contraband. *Long,* in dicta, supports the district court's denial of Campbell's qualified immunity claim; we, therefore, add to the admittedly sparse case law in this Circuit regarding the extent of protection the fourth amendment affords prison visitors. In doing so, we look to the case law from other circuits which clearly establishes the right of prison visitors to be free from the embarrassment and humiliation of a visual body cavity search unless the prison official first finds a reasonable suspicion that contraband is being concealed.

*Hunter v. Auger,* 672 F.2d 668 (8th Cir. 1982), is the first federal appellate decision to hold that the fourth amendment requires that a reasonable suspicion standard govern strip searches of visitors to penal institutions. *Id.* at 674. In *Hunter,* prison visitors brought an action against prison officials who, based on the receipt of anonymous information that the visitors would attempt to smuggle drugs during their visits, required the visitors to submit to a strip search before being permitted to visit. The *Hunter* court weighed the interest of correctional officials in securing the penal institution against the intrusion on personal privacy incident to a strip search and concluded that the strip search of a particular visitor is justified under the reasonable suspicion standard if the prison officials have "specific objective facts and rational inferences" that support the suspicion that a visitor will attempt to smuggle contraband into the prison. *Id.* at 674. *Hunter* further determined that the reasonable suspicion standard requires individualized sus-

---

**4.** The *Long* court, however, found that the inmate plaintiffs had pled a cause of action under the fourteenth amendment. The court reasoned that the mandatory language of the prison regulations created liberty entitlements for the in-

mates. *Long,* at 1116. Since the liberty interest was clearly established, the prison officials were required to meet the fundamental requirements of due process before violating that interest. *Id.* at 1116–17.

picion directed at the visitor targeted for the strip search. *Id.* at 675.[5]

The First Circuit, in *Blackburn v. Snow,* 771 F.2d 556 (1st Cir.1985), found that a policy requiring all prison visitors to be strip searched, "without *any* predicate requirement of individualized suspicion or showing of special and highly unusual institutional need," violated the fourth amendment. *Id.* at 562. The *Blackburn* court reasoned that prison visitors retain a legitimate expectation of privacy that is diminished by the exigencies of prison security. Nevertheless, prison visitors do not "suffer a wholesale loss of rights." *Id.* at 563. The severe interference with a prison visitor's privacy that occurs during a visual body cavity search is governed by the fourth amendment. The First Circuit, therefore, concluded that absent an unusual need for special security measures, "the Constitution normally requires a more particularized level of suspicion before individuals wishing to visit a jail may permissibly be subject to a grossly invasive body search." *Id.* at 564. Thus the *Blackburn* court found that the plaintiff's fourth amendment rights had been violated by the visual body cavity search which was conducted pursuant to a policy requiring all prison visitors to be searched.

The *Blackburn* court further denied the prison official qualified immunity stating, "[i]t can hardly be debated that Blackburn had, in 1977, a 'clearly established' Fourth Amendment right to be free from unreasonable searches. No court had intimated then, as no court has intimated today, that citizens who visit a penal institution forfeit the protections presumptively accorded them by the Bill of Rights." *Id.* at 569.

*Thorne v. Jones,* 765 F.2d 1270 (5th Cir. 1985), also addressed the standard govern-

ing the strip search of prison visitors. The relevant facts of *Thorne* are that the plaintiff was required to submit to a strip search before being permitted to visit his son in a maximum security state prison. The prison officials based their decision to require a strip search on information received from an inmate that the plaintiff's son was regularly receiving narcotics through the visiting room.

In weighing the legitimate penological security interest against the privacy interest of prison visitors, the *Thorne* court adopted the *Hunter* reasonable suspicion standard. The Fifth Circuit concluded that the reasonableness of a visitor search must be determined in the context of all of the facts and circumstances. *Id.* at 1276. Reasonable suspicion must attach to the person being searched. Reasonable suspicion is not readily transferred solely through association with others with whom reasonable suspicion has attached. *Id.* at 1277. Since there were no objective facts pointing to the plaintiff as the source of the narcotics being smuggled, the search was violative of the fourth amendment.

The *Thorne* court, nevertheless, granted the prison officials qualified immunity because at the time of the search, the law regarding the fourth amendment rights of prison visitors was not clearly established. When the search was conducted, only one district court had ruled on this issue. *See Black v. Amico,* 387 F.Supp. 88 (W.D.N.Y. 1974). The *Thorne* court found this sole district court case insufficient to provide prison officials with a clear indication that their actions would likely result in liability.

We find *Thorne*'s ruling on the qualified immunity issue distinguishable from our case. At the time of the search in *Thorne,*

---

5. In 1985, the Eighth Circuit reiterated that reasonable suspicion governed strip searches of prison visitors. *Smothers v. Gibson,* 778 F.2d 470, 472 (8th Cir.1985). In *Smothers,* a prison visitor was required to submit to a strip search before being permitted to visit her inmate son. The assistant warden claimed that he had received an informant's tip that the plaintiff would be bringing drugs into the prison.

The *Smothers* court found that the facts and circumstances giving rise to the search did not

meet the reasonable suspicion standard because the record did not contain any information regarding the nature of the tip, the reliability of the informant, or the degree of corroboration. The court, therefore, rejected the prison officials' claim that they were entitled to qualified immunity because the reasonable suspicion standard was not clearly established in December 1981 or January 1982 when the search occurred.

only one court had spoken on the legal standard required to justify a strip search of a prison visitor. In the instant case, in addition to *Black*, all circuits that have addressed this issue have adopted the reasonable suspicion standard. *Hunter, Blackburn, Thorne* and *Smothers* point unmistakeably to the unlawfulness of the conduct of the state officials under facts and circumstances virtually identical to the ones presented in this case.[6] All of these cases had been decided before January 1988. We, therefore, conclude that in January 1988 the case law addressing the predicate requirement of reasonable suspicion for the search of prison visitors provided "an authoritative, 'clearly established' rule forewarning the defendants ... on the pain of personal liability." *See Seiter*, 858 F.2d at 1177; *see also Long*, at 1116.

We hold that the case law clearly established the contours of the prison visitor's right to be free from a visual body cavity search in the absence of reasonable suspicion that he or she is carrying contraband. The Supreme Court, in *Anderson*, indicated that our denial of qualified immunity need not be based upon a previous holding that the very action in question—a visual body cavity search of a prison visitor without a prior finding of reasonable suspicion—is unlawful. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039. Yet, in the instant case, the very action in question has been held unlawful by every circuit considering the issue since 1982. The prison visitor cases from other circuits are similar enough to merit reasonable reliance upon them. *See Seiter*, 858 F.2d at 1177. We, therefore,

conclude that the unlawfulness of Campbell's conduct was apparent.[7]

### III.

For the foregoing reasons, we AFFIRM the June 14, 1989, order of the Honorable John T. Nixon, United States District Judge for the Eastern District of Tennessee.

DAVID A. NELSON, Circuit Judge, dissenting.

This is a close case, but I would resolve it in favor of Warden Campbell. To do otherwise, it seems to me, is to attribute greater legal acumen to Hickman County, Tennessee, officialdom than is realistic.

The question we are required to decide is whether in January of 1988 the proposition that the United States Constitution requires a finding of reasonable suspicion before prison visits can be conditioned on the visitors' agreeing to visual body cavity searches was a proposition so clearly established that any reasonable prison warden within the Sixth Circuit must have presumed to have known of it.

The proposition had never been endorsed by the United States Supreme Court. It had never been endorsed by our Sixth Circuit Court of Appeals. It had never been endorsed by the United States District Court for the Middle District of Tennessee, the district that includes the county (Hickman) where Warden Campbell's prison facility is located. And, as far as I am aware, the proposition had never been en-

---

**6.** In addition, case law involving the strip searches of individuals other than prison visitors has generally followed *Hunter's* mandate. *See Sec. & Law Enforcement Employees, Dist. Council 82 v. Carey*, 737 F.2d 187 (2d Cir.1984) (reasonable suspicion required to strip search prison guards and probable cause and a warrant required to conduct body cavity searches of prison guards); *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir.1983) (reasonable suspicion required to strip search misdemeanor arrestees confined while awaiting bail money).

**7.** We reach this holding without relying on Campbell's approval of the Department's guidelines requiring a prior finding of a higher standard—probable cause—before conducting a

strip search, visual body cavity search or manual body cavity search on a prison visitor. We, nevertheless, acknowledge the case law supporting the use of regulations as a basis for clearly established law. *Spruytte v. Walters*, 753 F.2d 498 (6th Cir.1985) (violation of clearly established state or administrative regulation provided sufficient proof to defeat state official's claim of qualified immunity in action alleging fourteenth amendment due process violation). While the Department's guidelines do not raise the fourth amendment's reasonable suspicion standard to probable cause, we note that a fourteenth amendment liberty interest may have been created. *Long*, at 1116–17.

dorsed by the Supreme Court of Tennessee or any lower court of that state.

The proposition had, however, been endorsed in recent years by federal courts of appeals sitting in St. Louis, Boston and New Orleans. In two of these cases the courts refused to allow the defendant prison officials to be subjected to any significant monetary liability,[1] but none of the three circuits in question had rejected the underlying proposition that prison visitors may not be asked to submit to searches comparable to that at issue in the case at bar without reasonable and particularized suspicion.

I have little doubt that most legal scholars, if asked in January of 1988 to predict whether the Sixth Circuit would take the same view, would have answered in the affirmative.[2] But ordinarily, at least, prison wardens are not legal scholars. Like many other officials charged with responsibility for the difficult nuts-and-bolts work of preserving domestic tranquility, prison wardens do not normally enjoy the advantages of a law school education and the leisure to ponder the advance sheets and speculate on how the law may or may not develop in the different circuits. As the Fifth Circuit put it in *Saldana v. Garza,* 684 F.2d 1159, 1165 (5th Cir.1982), *cert. denied,* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983),

"[I]f we are to measure official action against an objective standard, it must be a standard which speaks to what a reasonable officer should or should not know about the law he is enforcing and the methodology of effecting its enforcement. *Certainly we cannot expect our police officers to carry surveying equipment and a Decennial Digest on patrol; they cannot be held to a title-searcher's knowledge of metes and bounds or a legal scholar's expertise in constitutional law."* (Emphasis supplied.)

The relevant question in these qualified immunity cases is not whether a reasonable circuit judge (Bailey Aldrich, *e.g.*) or law professor could have believed the challenged conduct to be lawful; the question is whether a reasonable official in the position of the defendant could have believed it lawful. See *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987), where the Court declared that "[t]he relevant question in this case ... is ... whether a reasonable *officer* could have believed [the conduct in question] to be lawful...." (Emphasis supplied.) See also *Dominque v. Telb,* 831 F.2d 673, 676 (6th Cir.1987), as quoted in *Ohio Civil Service Employees Ass'n. v. Seiter,* 858 F.2d 1171, 1174 (6th Cir.1988), where we suggested that the issue was whether the plaintiff's rights "were so clearly established when the acts were committed that *any officer in the defendant's position,* measured objectively, would have clearly understood that he was under an affirmative duty to have refrained from such conduct." (Emphasis supplied.) Absent a Supreme Court or Sixth Circuit decision on point, *Seiter* teaches, the officer is entitled to qualified immunity unless the general case law is so overwhelming as to "leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional

---

**1.** In *Hunter v. Auger,* 672 F.2d 668 (8th Cir. 1982), which was decided before the Supreme Court's enunciation of the qualified immunity doctrine in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Eighth Circuit declared that it would not allow an award of more than nominal damages. A subsequent Eighth Circuit decision, *Smothers v. Gibson,* 778 F.2d 470 (8th Cir.1985), reversed a summary judgment for the defendants without imposing any such restriction. In *Thorne v. Jones,* 765 F.2d 1270 (5th Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1198, 1199, 89 L.Ed.2d 313 (1986), where the Fifth Circuit held that the defendant officials were entitled to prevail on qualified immunity grounds, the court noted that "in our Circuit portions of [the law in this area] become 'clearly established' only today." *Id.* at 1277. *Blackburn v. Snow,* 771 F.2d 556 (1st Cir.1985), upheld an award of substantial damages against the defendant officials, but Judge Bailey Aldrich, who dissented, maintained that his two colleagues on the First Circuit were committing "deep and conclusive error" in rejecting the claim of qualified immunity. *Id.* at 575.

**2.** Dicta in *Long v. Norris,* 929 F.2d 1111, 1116 (6th Cir.1991), a case decided more than three years later, support this conclusion.

grounds, would be found wanting." 858 F.2d at 1177. I do not read the general case law in this area as having that powerful an effect.

In *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), as the Supreme Court noted in *Block v. Rutherford,* 468 U.S. 576, 587–88, 104 S.Ct. 3227, 3233, 82 L.Ed.2d 438 (1984), the Court, dealing with a prison policy that required body cavity searches of all prisoners after contact with visitors,

> "sustained against a Fourth Amendment challenge the practice of conducting routine body cavity searches following contact visits, even though there had been only one reported attempt to smuggle contraband into the facility in a body cavity. 441 U.S. at 558–560 [99 S.Ct. at 1884–1885]. The purpose of the cavity searches in *Wolfish* was to discover and deter smuggling of weapons and contraband, which was found to be a by-product of contact visits. *Given the security demands and the need to protect not only other inmates but also the facility's personnel, we did not regard full body cavity searches [without particularized suspicion] as excessive."* (Emphasis supplied.)

*Wolfish* reminds us that "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." 441 U.S. at 559, 99 S.Ct. at 1884. The particular search with which we are concerned here, according to the plaintiff's own complaint, was ordered by Warden Campbell to determine whether the plaintiff was in possession of narcotics. There is no allegation in the complaint that the warden acted out of personal animosity or any other ulterior motive; as far as the complaint discloses, he simply wanted to make sure that the plaintiff did not bring narcotics into the prison. "We can take judicial notice that the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country." *Block v. Rutherford,* 468 U.S.

at 588–89, 104 S.Ct. at 3233–34. The Supreme Court has repeatedly reaffirmed, moreover, "the very limited role that courts should play in the administration of detention facilities." *Id.* at 584, 104 S.Ct. at 3231–32.

If Warden Campbell did not, in fact, have reasonable grounds to suspect the plaintiff of trying to conceal narcotics on her person—and it remains to be seen, of course, whether he actually had such grounds or whether probable cause for the search actually existed—the warden obviously made a mistake in ordering that the plaintiff be subjected to a body cavity search. It would have been a mistake regardless of any constitutional considerations, because the applicable regulations permitted such searches only in cases of probable cause. But a mistake in applying the regulations is not *ipso facto* a violation of the Constitution—and absent a definitive pronouncement on the constitutional question by the Supreme Court or the Sixth Circuit, I am not satisfied that the warden's mistake should subject him to personal liability for damages. "In an extraordinary case," *Seiter* teaches, it may be possible for the decisions of other courts to provide the clearly established law that is necessary to overcome the defense of qualified immunity. 858 F.2d at 1177. In today's world, unfortunately, the circumstances that led Warden Campbell to order the search at issue here can hardly be considered "extraordinary." I would therefore reverse the order of the district court and direct the entry of summary judgment for Warden Campbell on the ground of qualified immunity.