**Harry D. THOMAS, Plaintiff–Appellee,**

**v.**

**Lawrence WHALEN and Edward Ammann, Defendants– Appellants,**

**City of Cincinnati, Defendant.**

No. 93–4129.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 14, 1994.

Decided April 21, 1995.

Michael Hohn (argued and briefed), Cincinnati, OH, for Harry D. Thomas.

James F. McCarthy, III (argued and briefed), Fay D. Dupuis, City Solicitor's Office, Cincinnati, OH, for defendants-appellants.

Before: KEITH, WELLFORD, and DAUGHTREY, Circuit Judges.

DAUGHTREY, Circuit Judge.

This case stems from disciplinary action taken by police department officials against a Cincinnati Police Division officer who made several unauthorized public presentations — both oral and written—on behalf of the National Rifle Association, while wearing official insignia and identifying himself as a Cincinnati Police lieutenant. Alleging harassment and retaliation for the exercise of his free speech rights, the lieutenant, Harry D. Thomas, brought a civil rights action under 42 U.S.C. § 1983 against his supervisors, Chief of Police Lawrence E. Whalen and Assistant Chief of Police Edward Ammann, as well as the City of Cincinnati. In response to the defendants' motion for summary judgment, the district court dismissed the complaint against the City but denied summary judgment to Chief Whalen and Assistant Chief Ammann. They have appealed the district court's order.

Because we find that the defendants took reasonable administrative action to preclude Lt. Thomas from exploiting his uniform and his position in the police department, while

continuing to honor his First Amendment right to debate the propriety of gun control legislation, we conclude that the defendants did not violate a "clearly established right" belonging to the plaintiff. It follows that the two individual defendants were entitled to qualified immunity from suit and that the complaint against them should likewise have been dismissed. We, therefore, reverse the judgment of the district court.

## I.

Lt. Harry Thomas is an outspoken opponent of gun control laws and an active member of the National Rifle Association. On September 7, 1988, Thomas attended a rally in Washington, D.C., sponsored by the NRA to protest the Brady Bill. During the rally, Thomas appeared at a press conference and later spoke to various elected officials. He was dressed in civilian clothes, but verbally identified himself as a police officer.

Thomas alleged that after he returned from Washington, he had a conversation on September 18, 1988, with Assistant Chief Ammann, who at that time supervised the police bureau to which Thomas was assigned. According to Thomas, Ammann told Thomas that he was not a team player, could not expect to receive any support from the administration of the Police Division and was ruining his career by his opposition to gun control measures. Allegedly, Ammann also told Thomas that he was to be transferred and that he would not be informed of the reasons for the transfer. That day, Thomas said, he was transferred from District 3 to District 2. According to Whalen and Ammann, however, Thomas was actually transferred on September 14, 1988, along with ten other lieutenants, as part of a standard rotation.

On June 6, 1989, Thomas attended a second NRA-sponsored rally in Washington. He again spoke to media representatives and again was dressed in civilian attire. But this time, at the request of the NRA, he wore his police badge on the left breast pocket of his suit coat. Thomas was introduced to the press as a member of the Cincinnati police force.

In mid-July 1989, Thomas wrote an essay expressing his views on gun control, entitled "Why Gun Laws Waste My Time". The essay appeared in a newspaper for members of Congress called *Roll Call,* and later became a full-page NRA advertisement, reproduced in several other publications. Whalen received a copy of the essay after its initial publication, but prior to its subsequent uses. In August 1989, Whalen instructed Thomas to answer, in writing, a list of questions regarding the essay. Thomas was also "advised [that] the Chief has not authorized it to be published in any commercial media in the future. If there is a possibility that this article may become commercial, it would be proper to stop same."

In August 1989, Thomas's photograph appeared in a publication entitled *The Badge,* a publication which law enforcement members of the NRA receive free of charge. The photo showed Thomas at the Washington rally held on June 6, 1989, in civilian clothes with his badge displayed.

On October 15, 1989, Chief Whalen directed Thomas to submit to an internal affairs interview concerning his participation in the June 1989 rally. On November 6, 1989, Thomas received a written reprimand regarding his participation, based on an alleged violation of § 1.02 of the Police Division's Manual of Rules and Regulations and Disciplinary Process [1] and § 18.135 of its Police Procedure Manual.[2] Thomas was censured

---

**1.** Section 1.02 provides:

Members shall not commit any acts or omit any acts which constitute a violation of any of the rules, regulations, procedures, directives, or orders of the Division.

**2.** Section 18.135 provides:

Members must obtain Division approval before representing the Police Division at public gatherings, appearing on radio or television, preparing any article for publication, or acting as correspondents to a newspaper or periodical.

A. Purpose:

1. To provide qualified members for public appearances in response to citizen requests for speakers.

2. To provide guidelines for granting permission for public appearances.

3. To provide for a centralized file of public appearance data necessary for budget preparation and planning purposes.

for displaying his badge and for being introduced as "Lieutenant Harry Thomas, Cincinnati Police Department"; for failing to request permission to attend the news conference; and for failing to complete a "Public Appearance Report" upon his return to duty.

During July 1990, Thomas spoke at a rally sponsored by the Ohio Constitutional Defense Council in Dayton, Ohio, again opposing gun control.

On January 29, 1991, Thomas received his annual efficiency evaluation. Assistant Chief Ammann did not perform the initial evaluation, but was the reviewing officer. Ammann made comments[3] on the report in which he disagreed with the opinion of Thomas's immediate superior.

In October 1990, disciplinary charges were filed against Thomas for submitting a false affidavit in a court proceeding.[4] The charges were found to be true, and Thomas was suspended for two days. However, he appealed the finding to the civil service commission, which dismissed the charges.

On November 26, 1990, Ammann issued a written order to Thomas, regarding his responsibilities during public appearances and in attending court on behalf of a criminal defendant:

> You are not to appear in uniform, display any identification card, or display your Police Division badge.
>
> You are not to represent or identify yourself as a Lieutenant in the Cincinnati Police Division in any manner unless required through sworn court testimony.
>
> You will prohibit associates, affiliations, sponsors, etc. from making those representations on your behalf ...

> You will not attend court in an on duty status, nor will you be compensated by the Police Division. Your only compensation will be that provided to any other civilian witness; subpoena check.
>
> Nothing within this order prohibits you from exercising the same right as any other civilian in these matters.

On December 14, 1992, Thomas was on duty, scheduled to testify on behalf of a criminal defendant charged with felonious possession of an automatic weapon. Thomas drove an unmarked police car to the courthouse and parked the car in a zone adjacent to the courthouse, designated "No Parking Except Police Vehicles". He then reported to police communications that he was unavailable to receive any official police calls. After testifying, Thomas reported to police communications that he was available again.

While he was in court, the unmarked car was ticketed. Upon his return to his district, Thomas issued a request to the Police Chief for cancellation of the ticket (Cincinnati police procedure provides for the cancellation of tickets when an official vehicle is being operated by an officer in the performance of official duties). He justified the request by saying that "the car is an assigned Police Division vehicle and I was on duty when it was parked...." Assistant Chief Ammann denied the request because of his previous order that Thomas not testify while on duty. Thomas paid the eight-dollar fine.

In July 1991, Thomas filed this § 1983 action against Chief Whalen, Assistant Chief Ammann, and the City of Cincinnati. He alleged that Whalen and Ammann had interfered with, attempted to chill, and penalized

---

**3.** "This reviewer strongly disagrees with the Rater's overall grade [which, while easily within the average range, was second lowest among all lieutenants] but most significantly Items 2 & 8. Lt. Thomas has been a public zealot supporting policies completely opposed to both the professional law enforcement community as well as those of the Police Division. It is this Reviewer's opinion that Lt. Thomas' activities bring into question his ability to effectively lead an organizational component within the Police Division...."

**4.** Thomas served as an expert witness on behalf of several criminal defendants accused of various firearms-related crimes. In one such case,

Thomas signed an affidavit stating, "I have served as an instructor for Cincinnati police training intended to educate police officers in the safe handling of various types of firearms they may encounter in their duties as police officers." Apparently, the title "Instructor" designates a specific job position within the Police Division. Thomas had never been assigned as an instructor. However, one time Thomas was invited to give some information about certain weapons to the rest of a class at the firing range. On the basis of this experience, the civil service commission found that the affidavit was technically not misleading.

him for exercising his First Amendment rights. Thomas specifically alleged that his transfer, the memo regarding his published articles, the questioning regarding one of those articles, the disciplinary charges associated with the affidavit, Ammann's directive regarding Thomas's future activities, Ammann's unfavorable comments in his review, the parking ticket, and an incident with the SWAT team[5] constituted deliberate harassment by Whalen and Ammann because of his opposition to gun control laws.

On September 23, 1993, the district court dismissed Thomas's claims against the City because Thomas alleged no independent wrongdoing by the City. Moreover, the court found that no municipal policy or custom could have caused Thomas's alleged deprivation. However, the district court declined to grant summary judgment in favor of Whalen and Ammann and thus rejected their claim of qualified immunity, based on the court's finding that a genuine issue of material fact existed regarding the interests of the Cincinnati Police Division in regulating Thomas's speech.

The district court specifically found that "at the time of the Defendants' alleged conduct, it was at least clearly established in the Sixth Circuit that a police officer may not be disciplined for speaking on a matter of public concern unless the speech has adversely affected the operations and internal working of the police department" and that there was a material question of fact on that issue. The district court further found that even if Thomas's speech did adversely affect the Police Division, there was a question of material fact regarding the reasonableness of Ammann's and Whalen's conduct under the circumstances.

On appeal of the district court's ruling, however, the parties implicitly agree that the question before the court is one of law and not fact.

## II.

A district court's denial of a claim of qualified immunity is, of course, immediately appealable. *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817–18, 86 L.Ed.2d 411 (1985); *Cagle v. Gilley*, 957 F.2d 1347, 1348 (6th Cir.1992). Because application of the doctrine of qualified immunity to a particular defendant is a question of law, *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir.1988), this court reviews *de novo* the district court's determination. *Long v. Norris*, 929 F.2d 1111, 1114 (6th Cir.1991), *cert. denied sub nom., Jones v. Long*, 502 U.S. 863, 112 S.Ct. 187, 116 L.Ed.2d 148 (1991).

We begin our analysis in this case with the general proposition that government officials performing discretionary functions enjoy qualified immunity from liability for performance of their official duties. This immunity shields them from civil damages, provided that their actions "could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *see also Johnson v. Estate of Laccheo*, 935 F.2d 109, 111 (6th Cir.1991). Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action in question.

If a right the government official allegedly violated was clearly established at the time of the challenged conduct, "the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow v. Fitzgerald*, 457 U.S. 800, 818–19, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. To be outside the scope of qualified immunity, the

---

5. In August 1992, Thomas filed a supplemental complaint in which he alleged further harassment stemming from an incident occurring on May 17, 1992. On that date, Thomas said, he was the ranking officer at the scene of a domestic relations dispute, in which the husband (alone) had barricaded himself inside the home and was armed with a gun. Thomas requested a SWAT team, which request was denied by Ammann, who happened to be the senior command officer on duty that day.

very action in question need not have previously been held unlawful, but the unlawfulness must be apparent in light of pre-existing law. *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

■ In determining whether a constitutional right is clearly established, we must "look first to decisions of the Supreme Court, then to decisions of this Court and other courts within our circuit, and finally to decisions of other circuits." *Walton v. City of Southfield*, 995 F.2d 1331, 1336 (6th Cir.1993) (*quoting Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir.1991), *cert. denied*, 502 U.S. 1060, 112 S.Ct. 939, 117 L.Ed.2d 110 (1992)).

> In the ordinary instance, to find a clearly established constitutional right, a district court must find binding precedent by the Supreme Court, its court of appeals or itself. In an extraordinary case, it may be possible for the decisions of other courts to clearly establish a principle of law. For the decisions of other courts to provide such "clearly established law," these decisions must both point unmistakably to the unconstitutionality of the conduct complained of and be so clearly foreshadowed by applicable direct authority as to leave no doubt in the mind of a reasonable officer that his conduct, if challenged on constitutional grounds, would be found wanting.

*Ohio Civil Service Employees Ass'n v. Seiter*, 858 F.2d 1171, 1177 (6th Cir.1988).

■ In *Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987), the Supreme Court reaffirmed the test to be used in determining whether the speech of a public employee is constitutionally protected, albeit in a context materially different from the factual situation in this case:

> The determination whether a public employer has properly discharged an employee for engaging in speech requires "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." This balancing is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment. On the one hand, public employers are employers, concerned with the efficient function of their operations; review of every personnel decision made by a public employer could, in the long run, hamper the performance of public functions. On the other hand, "the threat of dismissal from public employment is ... a potent means of inhibiting speech." Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.

*Id.* at 384–85, 107 S.Ct. at 2896–97 (citations omitted) (*quoted in Williams v. Kentucky*, 24 F.3d 1526, 1534 (6th Cir.), *cert denied sub nom., Allen v. Williams*, — U.S. —, 115 S.Ct. 358, 130 L.Ed.2d 312 (1994)). Thus, determining whether the defendants could rightfully take adverse employment action against Thomas on the basis of his speech (or, to put it differently, whether they violated Thomas's clearly established rights) is a two-step process.

The threshold inquiry is whether the speech that Thomas cites as the basis for defendants' actions "may be 'fairly characterized as constituting speech on a matter of public concern.'" *Id.* (*quoting Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983)); *see also Wilson v. City of Littleton*, 732 F.2d 765, 769 (10th Cir.1984) (First Amendment did not protect police officer who wore a black shroud across his badge to mourn death of police officer from another town; not a matter of public concern). The debate over the propriety of gun control legislation is, obviously, a matter of public concern.

■ We must next determine whether Thomas's interest in speaking freely is outweighed by a state interest in promoting the efficiency of public services. *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2899. "The more central a matter of public concern the speech [or association] at issue, the stronger the

employer's showing of counter-balancing governmental interest must be." *Coughlin v. Lee,* 946 F.2d 1152, 1157 (5th Cir.1991). The determination of the appropriate balance is a legal determination to be made by the court. *Connick,* 461 U.S. at 150, 103 S.Ct. at 1691–92.

In essence, Thomas claims that the defendants have restricted his speech in two ways. He has been ordered, when pursuing his NRA-type advocacy, (1) "not to appear in uniform, display any identification card, or display [his] Police Division badge", and (2) not to "represent or identify [him]self as a Lieutenant in the Cincinnati Police Division". He admits that his speech and activities have not otherwise been restricted. Identification of Thomas as a police officer certainly has communicative force all its own, relevant to his comments in this arena. The wearing of Thomas's police badge in conjunction with his lobbying is similarly expressive. However, they must be analyzed separately to discern whether Thomas had a "clearly established right" in either area.

 "[F]reedom of speech is not traded for an officer's badge." *Biggs v. Village of Dupo,* 892 F.2d 1298, 1303 (7th Cir.1990); *see also, Boulware v. Battaglia,* 327 F.Supp. 368, 378 (D. Del.1971). Police officers, like teachers and lawyers, are not relegated to a watered-down version of constitutional rights by virtue of their public employment, or because such employment is within a command-oriented agency of local government. *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967).

However, in *Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440, 1445–46, 47 L.Ed.2d 708 (1976), the Supreme Court held that a law enforcement agency's "[c]hoice of organization, dress, and equipment for law enforcement personnel is a decision entitled to the same sort of presumption of legislative validity as are state choices designed to promote other aims within the cognizance of the State's police power." The Supreme Court has given deference to military uniform regulations when a public employee's First Amendment rights were at issue. "The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission, the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman v. Weinberger,* 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986).

A paramilitary law enforcement unit, such as the police, has many of the same interests as the military in regulating its employees' uniforms. In *United States Dep't of Justice v. Federal Labor Relations Auth.,* 955 F.2d 998 (5th Cir.1992), the Fifth Circuit concluded that allowing Immigration and Naturalization Service border patrol agents to wear union pins while on duty would create factionalism, interfere with discipline, and create an appearance of partiality. *Id.* at 1006. The court held:

> It is not unreasonable to assume that allowing this schism to manifest itself in the form of a pin on the uniforms of the pro-union agents will create added tension; in short, there will be occasions when a union button can be interpreted as a symbol of defiance against supervisors and as a split in solidarity among union and non-union agents, which will have an impact on mission, discipline, and esprit de corps.... [I]t is reasonable to conclude that allowing border patrol agents to wear union pins would interfere with an appearance to the public of neutrality and impartiality, which is important to the mission of all law enforcement agencies.

955 F.2d at 1007.

As the defendants now point out, no court has recognized a right to exploit one's rank in public employment solely for the purpose of enhancing credibility for personal or political gain—in effect, to use the fact of public employment as a "soap box" from which the employee can advocate a political position on an issue of public debate. In our own circuit, reasonable restrictions on the use of public employment to advance personal opinion have been found not to violate the employee's First Amendment rights. *See, e.g., Detroit Fire Fighters Ass'n, Local 334 v. City of Detroit,* 508 F.Supp. 172 (E.D.Mich.1981).

In *Detroit Fire Fighters,* the district court held that the City of Detroit could reasonably

restrict the public appearance of uniformed firefighters to advocate the defeat of a proposed charter amendment, without running afoul of the First Amendment. *Id.* at 177. In reaching its decision, the court noted that political neutrality on the part of a paramilitary organization such as the fire department outweighs the right of individual firefighters to appear in uniform in television advertisements advocating a position on a political issue. *Id.* The same analysis is patently applicable to the issue of gun control, where guns represent a daily life-and-death issue for every police officer.

In arguing that the action of the defendants violated Lt. Thomas's right of free speech, counsel for the plaintiff points to *Matulin v. Village of Lodi*, 862 F.2d 609 (6th Cir.1988), in which a part-time police officer was denied a permanent position because she answered certain questions from a reporter relating to charges of discrimination that she had leveled against the police department and that previously had been reported by the newspaper. This court found that denial of the permanent position violated the plaintiff's right to free speech but, at the same time, emphasized that its finding of public concern was "strengthened by the fact that the plaintiff did not solicit the attention of the media, but simply responded to questions regarding an existing controversy." *Id.* at 613. We take this ruling to mean that police officers need not hide the fact of their employment. In this case, however, Thomas was advertising and invoking his experience not just as a police officer, but as a highly ranked member of the Cincinnati Police Division, in a manner that entangled the Division in a matter of national controversy. *Cf. Rahn v. Drake Center Inc.*, 31 F.3d 407, 413 (6th Cir.1994).

We conclude from the foregoing analysis that, although Thomas may not be required to conceal his employment as a police officer, his right to speak as a member of the *Cincinnati* Police Division is not clearly established, when evaluated under the balancing test set out in *Rankin v. McPherson*, 483 U.S. at 384–85, 107 S.Ct. at 2896–97. The extra margin of credibility lent his cause by exploiting his affiliation does not outweigh the Cincinnati Police Division's interest in preserving the appearance of impartiality in areas closely related to its core mission.

Indeed, several courts have recognized the interest of a governmental entity in preserving the appearance of impartiality. *See e.g., United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers*, 413 U.S. 548, 565, 93 S.Ct. 2880, 2890, 37 L.Ed.2d 796 (1973) ("[I]t is not only important that the Government and its employees in fact avoid practicing political justice, but it is also critical that they appear to the public to be avoiding it, if confidence in the system of representative Government is not to be eroded to a disastrous extent."); *Paulos v. Breier*, 507 F.2d 1383, 1386 (7th Cir.1974) (recognizing and protecting interest of municipality in preserving nonpartisan police force and appearance thereof); *Connealy v. Walsh*, 412 F.Supp. 146, 158 (W.D. Mo.1976) (upholding juvenile court's ban on partisan bumper stickers on employee cars; compelling state interest in preserving public confidence in judiciary outweighs plaintiff's interest in publicly expressing her political preference through a bumper sticker). These arguments seem particularly relevant when applied to police employment and gun control, and thus buttress our conclusion that Lt. Thomas did not have a clearly established right to invoke the name of the Cincinnati Police Division or display the police department's insignia in order to enhance his own credibility in advocating a political position.

### III.

Despite the complexities of the law in this area, a review of certain undisputed facts in the record before us makes the ultimate determination easier. That record indicates that Chief Whalen and Assistant Chief Ammann have done nothing to interfere with Thomas's ability to communicate his pro-gun message; their actions were designed simply to dissociate the Cincinnati Police Division from that message. Thomas has not been penalized in any appreciable way even when called to task: his career has not been set back, his salary remains the same, and he concedes that he continues his First Amendment activities. Because Thomas's right to involve the Division in his NRA advocacy is

not clearly established by the proof, a burden that fell on Thomas, defendants Whalen and Ammann are entitled to qualified immunity. The judgment of the district court is therefore REVERSED, and the case is DISMISSED.